AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**NORTHERN** _____ DISTRICT OF _____ CALIFORNIA

~~FILED~~
JUN 6 - 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

v.

ALEXANDER VASQUEZ VALENTIN

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

CASE NUMBER:

**4 · 0 7 - 7 0 3 2 7**

WDP

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____April 4, 2007_____ in _____Contra Costa_____ county, in the _____Northern_____ District of _____California_____ defendant(s) did, (Track Statutory Language of Offense)

knowingly distribute a controlled substance, namely, methamphetamine

in violation of Title _____21_____ United States Code, Section(s) _____841(a)(1)_____

I further state that I am a(n) _____FBI Special Agent_____ and that this complaint is based on the following
    Official Title
facts:

See attached Affidavit

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Approved
As To
Form:
    AUSA:  Michelle Morgan Kelly

    _____
    Name/Signature of Complainant:

Sworn to before me and subscribed in my presence,

_____6 June 07_____
Date

The Honorable Bernard Zimmerman
United States Magistrate Judge
Name & Title of Judicial Officer

at    San Francisco, California
         City and State

_____
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

Document No.

District Court
Criminal Case Processing

UNITED STATES DISTRICT COURT            )
                                        ) ss:
NORTHERN DISTRICT OF CALIFORNIA         )

### AFFIDAVIT IN SUPPORT OF COMPLAINT AND SEARCH WARRANT

I, Doug Hunt, Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

## I.    INTRODUCTION

1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since October of 1995. I am currently assigned to the Violent Crimes and Major Offender Squad at the Oakland Resident Agency, San Francisco Field Office, where my responsibilities involve the investigation of gangs and narcotics trafficking. During my tenure in the FBI, I have been involved in numerous investigations of gang-related narcotics traffickers. I have participated in physical and electronic surveillance and undercover narcotics transactions, executed search warrants, and reviewed recorded conversations of drug traffickers. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

## II.    PURPOSE OF AFFIDAVIT

2.      This affidavit is being submitted in support of a Criminal Complaint and Arrest Warrant charging ALEXANDER VASQUEZ VALENTIN ("VALENTIN") with Distribution of Methamphetamine in violation of 21 U.S.C. § 841(a)(1) on April 4, 2007. This affidavit is also being submitted in support of an application for a warrant to search 2677 Rollingwood Drive, Apartment 22, San Pablo, California, (hereinafter, "the Target Residence"), further described in Attachment A. I believe the Target Residence is used by VALENTIN and his wife Evangelina

Gomez. As explained in detail below, I believe that evidence, contraband, and fruits and instrumentalities, further described in Attachment B, of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute a controlled substance), 846 (conspiracy to distribute controlled substances), and 843(b) (use of a communication facility to facilitate drug trafficking), will be found at the Target Residence.

3.      This affidavit is submitted for the limited purpose of securing the requested complaint, arrest warrant, and search warrant, and therefore, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to arrest VALENTIN for a violation of 21 U.S.C. § 841(a)(1), and probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, and 843(b) will be found at the Target Residence.

III.    **PROBABLE CAUSE**

**Background on CW-1**

4.      In April, 2007, Detective Kenneth Westermann of the Contra Costa County Sheriff's Department told me that, within the preceding several months, he had received information from a cooperating witness (hereafter referred to as "CW-1") concerning a methamphetamine supplier named "ALEX." Detective Westermann has utilized CW-1 for approximately one year. Detective Westermann met CW-1 during a search warrant of his/her residence in June, 2006, wherein approximately one quarter of a pound of methamphetamine was seized. Thereafter, CW-1 agreed to provide information and cooperate with the Contra Costa County Sheriffs's Office. Since that time, Detective Westermann is not aware of any instances in which CW-1 has provided false information. Detective Westermann has previously used CW-

1 in several different investigations, including a federal investigation involving narcotics trafficking in Richmond, California. He was able to corroborate information provided by CW-1. In the past year, CW-1 has made controlled purchases of methamphetamine at the direction and under the supervision of myself and Westermann. Information provided by CW-1 has led to arrests for burglary and robbery. Detective Westermann considers the information provided by CW-1 to be reliable.

5.    I have met with CW-1 on approximately ten occasions. I have had the opportunity to confirm the information CW-1 has given me on those occasions. I am not aware of any occasion on which CW-1 has provided false information. I consider the information provided by CW-1 to be reliable. CW-1 is providing assistance on this and other related criminal matters in exchange for the payment of future relocation and related expenses by the FBI. CW-1 has a potential pending charge resulting from a narcotics investigation by the Contra Costa County Sheriffs's Department. As mentioned previously, in this investigation, approximately one quarter of a pound of methamphetamine was located inside the residence of CW-1. No formal agreements have been made between the U.S. Attorney's Office or the District Attorney's Office and CW-1 regarding any resolution of these charges. Detective Westermann has advised CW-1, however, that so long as he/she provides truthful information, Detective Westermann will not seek charges based on the above-referenced conduct.

6.    I have reviewed CW-1's lengthy criminal history. CW-1 has arrests for narcotics trafficking, vehicle theft, battery, burglary, arson, criminal threats and weapons violations. CW-1 has criminal convictions for possession of a hypodermic needle, possession of a dangerous weapon, possession of a controlled substance for sale, receiving stolen property, felon in possession of a firearm, assault, and being under the influence of a controlled substance. CW-1

3

has admitted to me selling and using illegal narcotics.

**Information from CW-1 regarding "ALEX"**

7.      The purpose of the instant investigation was to use CW-1 to purchase methamphetamine from a person known to CW-1 as "ALEX." On April 3, 2007, CW-1 indicated he/she has known ALEX for several months. CW-1 estimated that he/she has purchased multi-ounce quantities of methamphetamine from ALEX approximately fifty times during that time period. CW-1 would usually call ALEX and request a quarter pound or half pound of methamphetamine. ALEX would usually deliver the methamphetamine to a residence used by CW-1 in Contra Costa County.  CW-1 indicated ALEX's cell phone number is 707-312-4028.

8.      CW-1 would frequently speak with ALEX's wife, EVA, to make arrangements for the deal.  CW-1 indicated he/she spoke with EVA in part because ALEX did not speak very much English.  Occasionally, EVA would accompany ALEX when he delivered methamphetamine to CW-1.  On at least one occasion, ALEX and EVA brought their children when delivering methamphetamine to CW-1.

**Text Message from "EVA"**

9.      CW-1 also indicated that EVA would sometimes assist ALEX with the distribution of methamphetamine.  CW-1 showed Detective Westermann a text message he/she received from EVA on March 28, 2007 at 3:19 p.m. Detective Westermann took a photograph of the text message.  Detective Westermann later showed me the photograph of the text message from EVA to CW-1.  It states:

        "alex wanted me to tell u

        that prices will go up to 850

4

because it is getting harder

to find work and it will get

harder"

I believe, based on my training and experience that this text message indicates that the price of methamphetamine from ALEX to CW-1 will increase to $850 per ounce.

**Controlled sale of methamphetamine from ALEX to CW-1 on April 3, 2007**

10.     On April 3, 2007, at the direction of Detective Westermann and myself, CW-1 conducted a controlled purchase of methamphetamine from ALEX. I have reviewed the reports regarding this controlled purchase, spoke with CW-1 regarding this controlled purchase of narcotics, participated in surveillance during the operation, and have reviewed the covert audio and video recording of this controlled purchase.

11.     Specifically, on April 3, 2007, at approximately 11:00 am, CW-1 called ALEX at 707-312-4028. During the call, CW-1 asked to purchase methamphetamine. ALEX agreed to sell CW-1 four ounces of methamphetamine for $900 per ounce. ALEX indicated he would bring the methamphetamine to the usual location, a residence used by CW-1 in Contra Costa County. This call was recorded.

12.     Thereafter, a search of CW-1 was performed prior to the installation of a recording device on his/her person. Surveillance was initiated around the location where ALEX usually delivered methamphetamine to CW-1. The source was provided with Contra Costa County cash funds to purchase methamphetamine and given instructions on how to conduct the transaction. Detective Westermann was present in a back room of the residence in which the controlled purchase of methamphetamine was to take place.

13.     At approximately 1:53 p.m., a blue Dodge Neon, California License 4PSH609,

5

was observed arriving at the predetermined location for the transaction.

14.    I have reviewed the covert audio and video recording of the above-described transaction and have discussed the transaction with Detective Westermann and CW-1.    The video recording depicts a Hispanic male and a young boy of approximately five years of age arriving at the agreed-upon residence.  CW-1 calls the Hispanic Male "ALEX" and asks why the child is not in school.  ALEX tells CW-1 that there is no school today for the child.  ALEX then enters the residence and gives something to CW-1.  Thereafter, CW-1 weighs two plastic baggies containing a white crystalline substance.  CW-1 can be clearly heard saying that he/she is weighing the baggies because last time the amount of methamphetamine was less than agreed upon.  ALEX indicates that he will make it up to CW-1 on the next transaction.  Thereafter, ALEX can be seen receiving cash from CW-1.  ALEX counts the cash and places it in a small package.  When ALEX is conducting the transaction and receiving the money, the video clearly depicts the child playing next to him.  As ALEX is about to depart the location, he tells CW-1 that his wife has just had another child.  The video shows ALEX and the child departing. Immediately thereafter, Detective Westermann is seen coming into the room, speaking with CW-1 and recovering the recording equipment and the two baggies containing the white crystalline substance.  These baggies were later placed into evidence.

15.    At approximately 2:00 p.m., surveillance units and myself observed the Dodge Neon, California License Plate 4PSH609 depart the residence.  The vehicle was followed continuously until it was stopped by a marked Contra Costa County Sheriffs's Department unit driven by Corporal Serita Ellison.  I have spoken briefly with Corporal Ellison regarding this traffic stop and reviewed the citation issued as a result of this traffic stop.  Corporal Ellison indicated she conducted a traffic stop of the Dodge Neon for an inoperable tail light and for

material hanging from the rear view mirror that obstructed the driver's view. She also stated the driver was a Hispanic Male and he had a young boy in the car with him. The driver produced California Driver's License D7473960, for ALEXANDER VASQUEZ VALENTIN, date of birth June 13, 1980, address of 2039 Maria Drive, Napa California. Corporal Ellison provided me with a copy of the traffic citation she issued to VALENTIN.

16.    I have reviewed the Department of Motor Vehicles (DMV) driver's license photograph for ALEXANDER VASQUEZ VALENTIN. I believe the person depicted in the driver's license photograph is ALEX, the same individual who can be seen selling the methamphetamine to CW-1 in the covert video recording.

**Registration information on the Dodge Neon, California License Place 4PSH609.**

17.    I have reviewed information from the California Department of Motor Vehicles regarding the Dodge Neon, California License Plate 4PSH609. Registration information for this vehicle indicates it is registered to Evangelina Gonzalez, 2039 Maria Drive, Napa, California.

**Surveillance of 2039 Maria Drive, Napa California**

18.    In April, 2007, Contra Costa Sheriff's Deputies conducted surveillance on several occasions at 2039 Maria Drive, Napa California, the listed address on VALENTIN's driver's license and the address on the registration of the Dodge Neon, in an attempt to locate VALENTIN. Neither VALENTIN nor the Dodge Neon, California License Place 4PSH609, were ever observed at that address.

**Information from CW-1 regarding VALENTIN and the Target Residence**

19.    In April 2007, Detective Westermann told me that he showed a California driver's license photograph of ALEXANDER VASQUEZ VALENTIN to CW-1. CW-1 told Detective Westermann the photograph depicted the individual he/she knew as ALEX. Detective

Westermann also showed CW-1 a photograph depicting Evangelina Gonzalez, date of birth October 12, 1983. CW-1 indicated that this was ALEX's wife, EVA. CW-1 also told Detective Westermann that VALENTIN had once given him/her a small package containing a promotional CD from a Internet Service Provider offering a month of free Internet Service. CW-1 gave Westermann the package containing the promotional CD. According to Detective Westermann, the small package was addressed to Current Resident, 2677 Rollingwood Drive Apartment 22, San Pablo California (hereinafter, "the Target Residence").

**Surveillance of Target Residence and Vehicle on May 23, 2007**

20.    On May 31, 2007, I spoke with Detective Jose Beltran of the Contra Costa County Sheriff's Department. He told me that on May 23, 2007, he conducted surveillance of 2677 Rollingwood Drive, the Target Residence. At that time, he observed the Dodge Neon, California License 4PSH609, located in the apartment building parking lot. Detective Beltran also indicated that after watching the apartment building for a period of time, he knocked on the door of Apartment 22, the Target Residence. Detective Beltran indicated that a woman answered the door of the apartment. Detective Beltran asked the woman if she would sign a petition. The woman said that she could not because her child was sleeping. Detective Beltran later reviewed a California Driver's License D2458931 depicting Evangelina Gonzalez, date of birth October 12, 1983. Detective Beltran told me that the woman depicted in the driver's license photograph of Evangelina Gonzalez was the same woman who answered the door at the Target Residence.

**Surveillance of Target Residence and Vehicle on May 31, 2007**

21.    On June 1, 2007, I spoke with Special Agent Nitiana Doss of the FBI. She told me that on May 31, 2007, she conducted surveillance of the Target Residence. At approximately 7:20 a..m, Special Agent Doss saw the Dodge Neon, California License 4PSH609, located in the

apartment building parking lot. Special Agent Doss also observed a woman exiting the Target Residence and retrieving mail from the apartment complex mail boxes. The woman then returned to Apartment 22. Special Agent Doss indicated that the woman exiting and then returning to the Target Residence was the same woman depicted in the photograph for California Driver's License D2458931, Evangelina Gonzalez.

**Surveillance of Target Residence and Vehicle on June 2, 2007**

22.    On June 3, 2007, I spoke with Special Agent Greg Eckhart of the FBI. He told me that on June 1, 2007, he conducted a brief surveillance of the Target Residence. At approximately 4:00 a..m, Special Agent Eckhart saw the Dodge Neon, California License 4PSH609, located in the apartment building parking lot.

**DEA Lab results regarding methamphetamine purchased from VALENTIN on April 3, 2007**

23.    On June 4, 2007, I reviewed Drug Enforcement Laboratory Results for the suspected methamphetamine purchased from VALENTIN on April 3, 2007. DEA report dated April 24, 2007, exhibit number 1B3, indicates that the narcotics purchased from VALENTIN tested positive for methamphetamine with a net weight of 111.9 grams, gross weight of 149.7 grams, and purity of 96.5%. The amount of actual drug found was 107.9 grams with a reserve weight of 111.1 grams.

**IV.    BACKGROUND INFORMATION REGARDING NARCOTICS TRAFFICKING**

24.    It is common for dealers of controlled substances to have controlled substances that are packaged for sale in the place where they live or sell from, in their vehicles, or on their persons. Individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug dealing in their residences and businesses, or the residences of friends or relatives, the locations used to facilitate their narcotics trafficking, and in surrounding areas to which they have ready access such as garages, car ports and outbuildings. They also conceal evidence in vehicles, including vehicles outside their residences or in the vicinity of their drug

distribution locations, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences and businesses. In addition, and in this case in particular, evidence has established that the co-conspirators involved in this investigation utilize vehicles registered in other people's names.

25.    Evidence also may be found in other areas to which a narcotics trafficker has ready access, such as rented storage areas and safety deposit boxes. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for manufacturing, weighing, packaging, and distributing drugs, other contraband, records and evidence of drug transactions, proceeds from sales of drugs, and assets purchased with the proceeds of narcotics trafficking.

26.    Individuals involved in illegal trafficking of narcotics commonly use certain equipment and paraphernalia to manufacture, weight, package, and prepare controlled substances for distribution. The paraphernalia includes packing materials (such as plastic baggier, balloons, wrapping paper, and cellophane), scales to weigh controlled substances, and cutting agents and dilutants to stretch the quantity of the controlled substance so they can increase their product amount and increase sales. Narcotics traffickers commonly store these items on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in abandoned residences near their drug distribution locations, in their vehicles, and in other areas to which they have ready access.

27.    Narcotics traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, sometimes years, to memorialize and record past transactions, the status of monies owed and received, and the names and telephone numbers of suppliers, customers, and co-conspirators. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calenders, memoranda, pay-owe sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books.

28.    These records described above often reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances,

10

customer lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his suppliers. Records often indicate locations and distribution points of controlled substances, and the purchase of materials, supplies and articles used by the trafficker, and by co-conspirators in the distribution of controlled substances. Records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled substances. These records include property rental and ownership records such as deeds of trusts and lease and purchase agreements, and vehicle registration, rental, and ownership information. These records are stored by narcotics traffickers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

29.    The records described above also can exist in electronic form on computers and in computer software and computer disks stored outside the computer. Further, data that is processed by a computer may be written to the computer hard drive or other storage medium even if the user does not intentionally save the information. For example, a computer operating system may take random data out of working memory and use it to "pad" files on a computer hard drive during the storage process. Electronic information can remain on computer storage media, such as hard drives, for an indefinite period of time. Even when a computer user attempts to delete records from a computer storage medium, the records may still exist and be recovered through computer forensic techniques.

30.    Narcotics traffickers often travel to facilitate their trafficking. Evidence of travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts related to travel such as car-rental receipts, fuel receipts, and hotel receipts, and passports and visas and their contents. These items are stored by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

31.    Narcotics traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site

storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money, and other valuables. Narcotics traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money, and other valuables in areas such as storage. Those documents and other items include rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles. Narcotics traffickers also often conceal evidence of drug dealing in vehicles outside their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packaging, documents and electronic storage devices (and their contents) evidence tending to show the distribution of narcotics (such as IOU's, pay-owe sheets, ledgers, lists of names and phone numbers, telephone address books, et cetera), digital pagers (and their contents), cellular/mobile telephones (and their contents), and counter-surveillance devices.

32.    Other evidence of transportation, ordering, possession, and sale of drugs can include the following: telephone bills to show the numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposits and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by narcotics traffickers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

33.    Narcotics traffickers usually sell their products for cash. Because pound quantities of methamphetamine can sell for thousands of dollars even at the wholesale level, dealers typically have thousands of dollars in cash on hand both as proceeds of sales and to purchase their own supplies. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, electronic equipment, computers, and other valuables.

34.     Evidence of significant, unexplained income of narcotics traffickers, or of the acquisition and concealment of money and assets from drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements, records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as computer data on computers and in computer software and computer disks. Also, records can be maintained in electronic organizers. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

35.     Narcotics traffickers typically use telephones, pagers, two-way radio systems, fax machines, other communication systems, counter surveillance devices, and related devices in their drug trafficking activities. These items are stored by drug dealers on their person or in their businesses, residences or cars, or the residences of friends or relatives. These items are typically equipped with data storage capability and contain phone numbers and/or electronic messages relating to drug trafficking activity. Information stored in electronic form on all of the above devices can provide evidence of drug trafficking and the identity of associates. For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the narcotics trafficker is calling, and thus the identity of potential customers and suppliers. Pagers, cellular telephones, and other communication devices can contain similar information. Also, logs from fax machines can be evidence of messages sent and received, and the corresponding telephone numbers of possible associates and co-conspirators. Often, telephone answering machines retain recorded messages. The incoming messages can provide evidence of drug trafficking and the identity of associates while the outgoing message can provide evidence of who controls the telephone line.

36.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds, and mortgage receipts.

37.    Narcotics traffickers, often maintain firearms and ammunition on their person or in their homes, businesses, cars or residences, businesses or cars of associates or family members to protect themselves and their narcotics and assets purchased with narcotics trafficking proceeds. They also may maintain indicia of firearms and ammunition possession such as receipts for firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other documentation for firearms and ammunition.

38.    As discussed above, narcotics traffickers often conceal evidence of drug dealing in vehicles outside their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packaging, documents and electronic storage devices (and their contents) evidence tending to show the distribution of narcotics (such as IOU's, pay-owe sheets, ledgers, lists of names and phone numbers, telephone address books, et cetera), digital pagers (and their contents), cellular/mobile telephones (and their contents), and counter-surveillance devices.

## V.    SEARCH AND SEIZURE OF COMPUTERS

39.    Computer Hardware: Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers,

14

scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

40.     Computer Software:  Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

41.     Computer-Related Documentation:  Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

42.     Computer Passwords and Other Data Security Devices:  Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

43.     Based on my knowledge, training, and experience, and consultations with FBI agents who are experienced with computers and specially-trained in computer search and seizure, I have learned that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (a) the items themselves may be  instrumentalities, fruits, and/or evidence of crime; and/or (b) the items may have been used to collect and store information about crimes (in the form of electronic data).  Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are: (a) instrumentalities, fruits and/or evidence of crime; and/or (b) storage devices for information about crimes.  In addition, I have learned and know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices

15

1   (along with related peripherals) to be searched later by a qualified computer expert in a

2   laboratory or other controlled environment. This is true because of the following: (a) computer

3   storage devices can store the equivalent of thousands of pages of information; (b) electronic

4   records and information can remain on computer storage media, such as computer hard drives,

5   for an indefinite period of time; (c) searching computer systems for criminal evidence is a highly

6   technical process requiring expert skill and a properly controlled environment; and (d) the

7   analysis of electronically stored data, whether performed on site or in a laboratory or other

8   controlled environment, may entail any or all of several different techniques.

9        44.     In executing this warrant, any computer searches will be conducted consistent

10  with this District's Computer Search Protocol, attached hereto as Attachment C.

11  **VI.    <u>CONCLUSION</u>**

12       45.     For the reason stated above, I believe that probable cause exists for a Criminal

13  Complaint and Arrest Warrant charging ALEXANDER VASQUEZ VALENTIN with

14  Distribution of Methamphetamine in violation of 21 U.S.C. § 841(a)(1) on April 4, 2007.

15  Furthermore, I believe there is probable cause to support an application of a search warrant for

16  2677 Rollingwood Drive, Apartment 22, San Pablo, California, further described in Attachment

17  A, for evidence, contraband, and fruits or instrumentalities, further described in Attachment B, of

18  violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute a controlled substance),

19  846 (conspiracy to distribute controlled substances), and 843(b) (use of a communication facility

20  to facilitate drug trafficking). I therefore respectfully request that the Court issue the requested

21  Criminal Complaint, Arrest Warrant, and Search Warrant.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1

**Request to Seal**

2        46.    VALENTIN is unaware of the current investigation. Public filing of the

3   Complaint or Search Warrant could alert VALENTIN to the investigation and result in his flight

4   or in the destruction of contraband or other evidence. Accordingly, I respectfully request that the

5   Criminal Complaint, Arrest Warrant, and Search Warrant, this Affidavit, the Application for

6   Sealing, and this Court's Sealing Order be sealed.

7

8

9                                 DOUG HUNT

10                                Special Agent, Federal Bureau of Investigation

11

12   Sworn to before me this
        __ day of June, 2007

13

14

15   THE HONORABLE BERNARD ZIMMERMAN
     UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A**

**Location to Be Searched**

The Target Residence is 2577 Rollingwood Drive, Apartment 22, San Pablo, California. The Target Residence is located in the Aztec Apartment complex at 2577 Rollingwood Drive and is a two story, approximately 30-unit complex with an enclosed courtyard and a pool. The apartments have green doors with silver digits displaying the appropriate apartment number. Apartment number 22 is located on the south side of the building with its green door facing north and the number 22 is displayed in silver digits. Apartment number 22 is located immediately above the laundry room, on the second floor of the complex, immediately right of the southwest set of stairs.

## ATTACHMENT B

### Items to Be Seized

(1)    Controlled substances, including substances containing a detectable amount of methamphetamine (regardless of form, i.e., whether wholly or partially pure, diluted in preparation for distribution, or in any preparatory form); and any other controlled substances found on the premises (regardless of form);

(2)    Equipment and paraphernalia used in the manufacture, sale, distribution, preparation for sale or distribution (e.g. dilution or cutting) or use of methamphetamine, including scales, measuring devices, balloons, plastic baggier, plastic wrap, plastic envelopes, and cutting and adulteration agents;

(3)    Paper writings and records evidencing the manufacture, sale, distribution, or possession of controlled substances, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, evidence of off-site storage (such as storage locker receipts and safety deposit box rental records and keys), documents reflecting domestic and international travel (such as airline tickets, itineraries, and passports), and receipts showing travel (such as airline receipts, car rental receipts, hotel receipts, and fuel receipts);

(4)    United States or foreign currency derived from the sale of controlled substances in violation of 21 U.S.C. §§ 841 and 846, and money wrappers, rubber bands, money containers, and money counting machines;

(5)    Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashiers checks, certificates of deposit, and money orders;

(6)    Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds of the sales of controlled substances;

(7)    Any boxes, bags, briefcases, suitcases or containers used to carry controlled substances;

(8)    All firearms, ammunition, and other items relating to the possession, maintenance and use of firearms, including ammunition magazines, speed loaders, ballistic vests, spare firearms parts, holsters, cleaning kits, and all other documentation which relates to the possession, sale or transfer of firearms, including but not limited to photographs, receipts for the purchase or repair of firearms, firearm containers, carrying cases, and firearm boxes;

(9)    Documents, items, and indicia tending to establish the identity of persons in control of the premises and/or things described in this warrant, including utility bills, rent

19

receipts, canceled checks, bank and other financial statements and records, deposit receipts, passports, driver's licenses, social security cards, mail, and other identification documents, land and lease titles, escrow papers, photographs, video and audio records, and keys; and

      (10)    Devices or media that store data electronically, including personal computers, desktop computers, laptop computers, personal digital assistants ("PDA's"); mobile telephones, pagers, and answering machines (collectively, "Electronic Devices") that could contain evidence of the manufacture or distribution of controlled substances or participation in a conspiracy to manufacture, distribute, and/or possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1), or use of such devices in violation of 21 U.S.C. § 843(b). Electronic Devices will be searched for the following evidence:

     (a)    Names and contact information of individuals who may be engaged in narcotics trafficking contained in any Electronic Device;

     (b)    Logs of calls (which would include last numbers dialed, last calls received, time of calls and duration of calls) both to and from an Electronic Device;

     (c)    Text messages both sent to and received from an Electronic Device relating to or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking;

     (d)    Incoming and outgoing voice mail messages both to and from an Electronic Device relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking;

     (e)    Browser messages and/or internet communications (e.g., e-mail; text messages) both to and from an Electronic Device relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking; and

     (f)    Documents in electronic format, including Microsoft Word or Adobe PDF files, relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking.